[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 12, 2004
THOMAS K. KAHN
CLERK

_____

No. 00-15807

_____

D.C. Docket No. 96-00097-3:CV-DF

JOHN WASHINGTON HIGHTOWER,

Petitioner-Appellant,

versus

DERRICK SCHOFIELD,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(April 12, 2004)**

Before TJOFLAT, ANDERSON and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge.

Petitioner John Washington Hightower, a Georgia prisoner, seeks a writ of habeas corpus setting aside his 1988 convictions and sentences for capital murder. The district court denied his petition. We affirm.

I.

The Supreme Court of Georgia summarized the facts of this case as follows:

> The defendant was married to Dorothy Hightower. Her brother stopped by their home early in the morning of July 12, 1987, to pick up his daughter. Dorothy Hightower's car was gone. The brother entered the home and found that Dorothy Hightower and her two daughters, Evelyn and Sandra Reaves, had been shot. Evelyn Reaves was still alive, but died two days later. Sandra Reaves and Dorothy Hightower were dead. The brother's daughter was unharmed.
>
> Two and one-half hours later, the defendant was arrested driving his wife's car. Inside the car was a bloody handgun. He confessed later that morning. He told police that he and his wife had been having marital problems, and he had purchased the murder weapon the day before. He hid it under his pillow until 3:00 a.m., when he shot his wife. He then went to the bedroom occupied by his stepdaughter Sandra Reaves. She got out of bed, but then lay back down. He shot her in the head. Evelyn Reaves tried to leave the house, but the defendant caught her and shot her three times.

Hightower v. State, 386 S.E.2d 509, 510 (Ga. 1989).

After a trial held from April 28, 1988, to May 4, 1988, a jury in Morgan County, Georgia,[1] convicted Hightower of three counts of murder. In the penalty

---

[1] Hightower was indicted in Baldwin County on July 14, 1987. At a hearing on January 15, 1988, the superior court granted Hightower's motion for a change of venue, and ordered that

phase, the jury found an aggravating circumstance as to each murder, namely, that Hightower had committed each murder in the course of the commission of another murder.[2] The jury recommended death sentences on each of the three counts of murder. The trial court entered these sentences as required by Georgia law.[3]

Hightower sought, but was denied, a new trial. The Georgia Supreme Court affirmed Hightower's convictions on direct appeal, Hightower v. State, 386 S.E.2d 509 (Ga. 1989), and denied his motion for reconsideration. The Supreme Court of the United States denied Hightower's petition for a writ of certiorari, Hightower v. Georgia, 498 U.S. 882, 111 S. Ct. 230, 112 L. Ed. 2d 184 (1990), and his petition

---

venue be changed to Morgan County for trial. On February 25, 1988, the court quashed the indictment on the ground that African-Americans were underrepresented on the venire from which the grand jury had been drawn. A new indictment was returned on March 18, 1988, and Hightower was arraigned on April 15, 1988. On April 20, 1988, the superior court issued an order nunc pro tunc January 15, 1988, incorporating into the record of the new case all motions, orders, and rulings from the earlier case.

[2] O.C.G.A. § 17-10-31 requires that a death sentence be supported by "a finding of at least one statutory aggravating circumstance." One sufficient aggravating circumstance for murder is that it "was committed while the offender was engaged in the commission of another capital felony or aggravated battery." O.C.G.A. § 17-10-30. Hightower's jury found that (1) the murder of Dorothy Hightower was committed while Hightower was engaged the commission of the murder of Evelyn Reaves, (2) the murder of Sandra Reaves was committed while Hightower was engaged in the commission of the murder of Dorothy Hightower, and (3) the murder of Evelyn Reaves was committed while Hightower was engaged in the commission of the murder of Sandra Reaves.

[3] O.C.G.A. § 17-10-31 provides that "[w]here a statutory aggravating circumstance is found and a recommendation of death is made, the court shall sentence the defendant to death."

for rehearing, <u>Hightower v. Georgia</u>, 498 U.S. 995, 111 S. Ct. 549, 112 L. Ed. 2d 557 (1990).

Hightower then petitioned the Superior Court of Butts County, Georgia, for a writ of habeas corpus.[4] After an evidentiary hearing, the court denied his petition. The Georgia Supreme Court denied Hightower's application for probable cause to appeal and his subsequent motion for reconsideration. The Supreme Court of the United States denied Hightower's petition for a writ of certiorari, <u>Hightower v. Thomas</u>, 515 U.S. 1162, 115 S. Ct. 2618, 132 L. Ed. 2d 860 (1995), and his petition for rehearing, <u>Hightower v. Thomas</u>, 515 U.S. 1183, 116 S. Ct. 30, 132 L. Ed. 2d 912 (1995).

Having pursued all state court avenues of relief, Hightower sought habeas corpus relief in the United States District Court for the Middle District of Georgia. The district court denied his petition, concluding on the basis of the records of the state court proceedings that none of his claims had merit.[5] The district court thereafter granted Hightower's application for a certificate of appealability pursuant to 28 U.S.C. § 2253(c), concluding that he had made a "substantial showing of the denial of a constitutional right" with respect to each of his claims.

---

[4]Hightower petitioned that court because he was incarcerated in Butts County.

[5]The court also denied Hightower's Federal Rule of Civil Procedure 59(e) motion to alter and amend the judgment.

In this appeal, however, Hightower challenges the district court's disposition only of a portion of his claims.[6] He contends that the state trial court committed constitutional error by (1) failing to provide him with the assistance of a qualified psychiatrist as required by Ake v. Oklahoma, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985), and by neglecting to conduct hearings on his Ake requests ex parte; (2) allowing the prosecutor peremptorily to strike African-Americans from the jury, in contravention of Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986); and (3) permitting jurors unconstitutionally biased in favor of the death penalty to serve on his jury. He also claims that his two court-appointed lawyers provided constitutionally ineffective assistance under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

---

[6]Hightower has abandoned the following claims by not including them in his brief: (1) the prosecutor engaged in various forms of misconduct before and during the trial, depriving him of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to a fair trial and a reliable sentencing proceeding; (2) the trial court violated his rights under the Fifth and Fourteenth Amendments by failing to have all proceedings against him transcribed and made part of the record; (3) the State obtained his confession and used it against him at trial in contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments; (4) the trial court violated his rights under the Eighth and Fourteenth Amendments by providing misleading and incomplete instructions to the jury during the penalty phase of his trial; (5) the trial court violated his Fourteenth Amendment due process rights by allowing the prosecutor to introduce allegedly inflammatory victim impact evidence; and (6) his attorneys were constitutionally ineffective in numerous ways beyond those cited in his brief to us.

## II.

On April 24, 1996, President Clinton signed into law the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, which amended the federal habeas corpus provisions of 28 U.S.C. § 2254.  Because Hightower filed his habeas petition after the AEDPA's effective date, that law's provisions apply.  Penry v. Johnson, 532 U.S. 782, 792, 121 S. Ct. 1910, 1918, 150 L. Ed. 2d 9 (2001).

As amended by AEDPA, 28 U.S.C. § 2254 states:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As the Supreme Court has held,

[u]nder the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas

6

court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000). The phrase "clearly established Federal law," as that term appears in section 2254(d)(1), "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state court decision." Id. at 412, 120 S. Ct. at 1523. Furthermore, a habeas petitioner can overcome a state court's "presumption of correctness" on factual determinations only by coming forth with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As a general rule, in reviewing a district court's grant or denial of a habeas petition, we review the district court's findings of fact for clear error, and review de novo both questions of law and mixed questions of law and fact. Nyland v. Moore, 216 F.3d 1264, 1266 (11th Cir. 2000). In this case, because the district court "neither held an evidentiary hearing nor made any independent findings of fact," we review its holdings de novo, mindful that "we (like the district court) are reviewing, in essence, [the] decision[s] of the courts of Georgia." Putman v. Head, 268 F.3d 1223, 1240 (11th Cir. 2001).

7

III.

Hightower raises two separate claims under Ake v. Oklahoma, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).  We address these in turn.

A.

Hightower first claims that he was denied his rights under Ake to the assistance of a competent psychiatrist.  Hightower unsuccessfully raised this claim on direct appeal to the Georgia Supreme Court.[7]  Hightower v. State, 386 S.E.2d 509, 511 (Ga. 1989).  Thus, under 28 U.S.C. § 2254(d), for Hightower to prevail on this claim, the decision of the Georgia Supreme Court  must have been "contrary to, or . . . an unreasonable application of, clearly established" United States Supreme Court precedent, or "based on an unreasonable determination of the facts in light of the evidence."  We hold that it was not.  Because Hightower failed to make the threshold showing required to trigger his rights under Ake, and received defense funds that he could have used for a psychiatric expert, his claim fails.

---

[7]Hightower later brought this claim before the Superior Court of Butts County.  That court refused to review the claim, citing Gunter v. Hickman, 348 S.E.2d 644 (Ga. 1986).  Gunter held that an "issue . . . actually litigated, i.e., raised and decided [on] direct appeal . . . cannot be reasserted in habeas corpus proceedings" in Georgia state courts.  Id. at 644-45 (citations omitted).

1.

The Supreme Court in <u>Ake</u> considered the constitutional right of indigent criminal defendants to psychiatric assistance. In that case, Ake, the defendant, notified the trial court during a pretrial conference of his intention to raise an insanity defense, and requested the appointment of, or funds to hire, a psychiatrist. <u>Ake</u>, 470 U.S. at 72, 105 S. Ct. at 1090. The court denied the request. <u>Id.</u> at 72, 105 S. Ct. at 1090-91. At the guilt phase of Ake's trial, "there was no expert testimony for either side on Ake's sanity at the time of the offense," even though "his sole defense was insanity." <u>Id.</u> at 72, 105 S. Ct. at 1091 (emphasis omitted). The jury found him guilty. <u>Id.</u> at 73, 105 S. Ct. at 1091. At the sentencing phase, Ake, without a psychiatric expert, could not rebut the testimony of state psychiatrists who claimed he was "dangerous to society," and could not "introduce on his behalf [psychiatric] evidence in mitigation of his punishment." <u>Id.</u> at 72, 105 S. Ct. at 1091. The jury returned a death sentence. <u>Id.</u>

The Supreme Court ruled in Ake's favor, holding under the Due Process Clause of the Fourteenth Amendment

> that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

9

470 U.S. at 83, 105 S. Ct. at 1096. The Court found that the trial court was adequately "on notice" that "Ake's mental state at the time of the offense was a substantial factor in his defense," id. at 86, 105 S. Ct. at 1097, due in large part to the following facts: (1) Ake's sole defense was insanity; (2) the trial court, sua sponte, had ordered that Ake be examined by a psychiatrist to determine the cause of his "bizarre" behavior at arraignment; (3) a state psychiatrist later found Ake incompetent to stand trial; (4) Ake was deemed competent "only on the condition that he be sedated" with medication during the trial; and (5) psychiatrists who examined Ake for competency did so within six months of the offense, and opined that his "mental illness might have begun many years earlier." Id. at 86, 105 S. Ct. at 1098.

Because "[a] defendant's mental condition is not necessarily at issue in every criminal proceeding," id. at 82, 105 S. Ct. at 1096, the right to psychiatric assistance is not automatic. Rather, this right hinges upon the sufficiency of the defendant's preliminary showing to the trial court that there is a "substantial basis for the defense" that the expert will assist in presenting. Moore v. Kemp, 809 F.2d 702, 712 (11th Cir. 1987) (en banc). While defense counsel "cannot be expected to provide the court with a detailed analysis of the assistance an appointed expert might provide," he is nonetheless "obligated to inform himself about the specific

scientific area in question and to provide the court with as much information as possible concerning the usefulness of the requested expert" to the defense. Id. The trial court must then examine the evidence before it, make all necessary inferences, and determine whether the provision of psychiatric assistance is warranted.

> In reviewing an Ake claim like Hightower's, we look to
>
> the reasonableness of the trial judge's action at the time he took it. This assessment necessarily turns on the sufficiency of the petitioner's explanation as to why he needed an expert. That is, having heard petitioner's explanation, should the trial judge have concluded that unless he granted his request petitioner would likely be denied an adequate opportunity fairly to confront the State's case and to present his defense?

Id. at 710. The sources available to the trial court in considering Hightower's request for psychiatric assistance included (1) written motions and exhibits, (2) defense counsel's representations at pretrial proceedings, and (3) Hightower's behavior at pretrial proceedings. We "[place] ourselves in the shoes of the trial judge [and] analyze the information he received as it was brought before him." Messer v. Kemp, 831 F.2d 946, 961 (11th Cir. 1987) (en banc). In so doing, we conclude that Hightower failed to satisfy his preliminary burden under Ake, and was therefore not entitled to the services of a psychiatrist.

11

a.

Hightower's attorneys first notified the trial court of their desire for expert psychiatric assistance in a written motion dated August 6, 1987. The full text of the motion reads as follows:

Motion for Funds to Hire Independent Psychiatrists

1. The defendant, John Hightower, was arrested on July 10, 1987, and charged with three counts of Murder.

2. The said Defendant was indicted by the Baldwin County Grand Jury on July 14, 1987, for said offenses.

3. The District Attorney of Baldwin County, Georgia, Mr. Joseph Briley, has announced that he intends to seek the death penalty in the prosecution of said case.

4. Counsel for Defendant feel that the defendant's mental state, together with the presence or absence of any mental disorder or disease, may be of importance in the defense of said action.

5. Defense counsel were appointed by this Honorable Court to represent the Defendant, the said Defendant having been found previously indigent by this Court.

6. Defendant is without sufficient funds of any kind with which to hire independent psychiatric or psychological experts, and feels that the same would be needed in order to insure him all of his due process rights under the Georgia and the United States Constitutions.

7. Defendant believes that independent psychiatric and/or psychological evaluations need to be accomplished in order to assure that any and all defenses can be properly presented at trial.

12

Wherefore, Defendant prays that funds be provided to his counsel of record for the purpose of employing independent psychiatric and/or psychological experts in the defense of his case.

This 6th day of August, 1987.

/s/ Hulane E. George, Attorney for Defendant
   B. Carl Buice, Attorney for Defendant

The court heard arguments on this and other motions at a hearing on August 31, 1987. At the hearing, the court asked defense counsel whether they intended to "make a motion for an examination at Central State Hospital." They answered in the negative, and asked that the court consider instead their motion for funds to hire an independent psychiatrist. The court, pursuant to Ake, ordered counsel to make a preliminary showing that Hightower's sanity at the time of the offense was likely to be a significant factor at trial. Carl Buice, one of Hightower's two attorneys,[8] offered the following:

> May it please the Court. Where we are at this point in this issue is at a very preliminary threshold because if we were not there we would get into a very circuitous situation. Obviously in order to determine clearly what we are going to need in the way of psychiatric testimony we need the help of a psychiatrist. It is not possible to evaluate fully the mental condition of the defendant without professional assistance to assist us in doing that and if the Court would note, the Ake decision

---

[8]The court initially appointed Alan Thrower to represent Hightower. On July 17, 1987, 5 days after the murders, the court granted Thrower's motion to be relieved as counsel due to a conflict of interest. Four days after granting the motion, the court appointed Hulane E. George and B. Carl Buice to represent Hightower. George and Buice were a married couple who were also law partners. They served as Hightower's counsel both at trial and on direct appeal.

does not just have to do with the defense of insanity, but goes on to talk about whether the mental condition of the defendant is going to be a factor at the trial of the case which has to do not only with the guilt/innocence phase or any plea of not guilty or of guilty but insane or not guilty for reasons of insanity, but also in the area of litigation and extenuation in terms of whether there are any characteristics of the defendant which would be mitigating of the circumstances in the event that he was convicted. Now, the only thing we can present to the Court at this point in the absence of having expert testimony is that which is already apparent in the record. That is, that we have here a man who is charged with three murders, the murder of his wife and two stepdaughters. This comes in a situation in a life history in which there has been no previous violence. We have a situation where a person of no demonstrated erratic behavior performs an act which is in and of itself according to the charge of the district attorney, stunningly abhorrent. The event itself, the facts themselves raise the question of the mental state of the defendant and the circumstances which would lead up to such an event, not just in terms of insanity which, of course, is a legal term and not a mental health term, but in terms of all the factors in the defendant's psyche which might relate to this event and be important in the defense of his case, not only in the defense in the guilt and innocence phase, but in any phase of the trial in extenuation and mitigation. So, what we are asking for at this point in regard to this particular thing is some preliminary funds for a psychiatric evaluation on the part of a psychiatrist who is a part of the defense team who has— to whom we have access and with whom we can consult in the building of our defense of this man so that we can know what further issue we may need to raise in terms of psychiatric evaluation, what defenses we need to file in terms of this man's condition, whether we have defenses which are defenses in the guilt/innocence phase or are just issues in the extenuation or sentencing phase. All of these are matters that we cannot determine without having the benefit of counsel from a competent psychiatrist, someone trained in the mental health field who can help us know what to look for in terms of this man's personality. This is no small issue in a case of this nature. The mental state of the defendant is going to be a key factor all the way through and if we are to provide him with an

14

adequate defense, if we are to be able to raise the issues which need to be raised in this case or at least consider the issues which may need to be raised, we need that expert assistance ab initio from the very beginning. To make us— to require us to make a showing in terms of some professional evidence in the case where we have no authority to get a professional to develop the evidence and have no resource to a professional to determine what sort of issues may be available to us, denies us of access to that whole area of defense from the very beginning.

In response to this statement, the court asked Buice how much money they needed for a psychiatric expert. He said they needed $750 "[o]n a preliminary basis, reserving the right to ask for an additional amount in terms of what we may find as we go forward." The court granted the motion and "authorize[d] [counsel] to expend up to" $750. The court also left open the possibility of granting more funds in the future, but only after another hearing.

At this point, the prosecutor moved that Hightower be admitted to Central State Hospital for a "psychological evaluation," so that the State could rebut any "claim as to mental incompetency" that the defense might raise at either phase of the trial. Defense counsel opposed the motion, stating that they would have Hightower evaluated by his own psychiatrist. The court asked when counsel intended to have Hightower examined by their psychiatrist. They said they planned to have him examined that very week. Buice, presumably referring to a psychiatric

15

expert he had already contacted, added: "He has already done some preliminary interviews. He is in the process."

In response to the prosecutor's protests that the defense was merely seeking to "sandbag" the State by preventing it the opportunity to examine Hightower, the court purported to grant the prosecutor's motion. But given defense counsel's representation that Hightower would soon be evaluated by his own expert, the court delayed his transportation to Central State Hospital for two weeks.

We now place ourselves in the position of the trial court and evaluate the evidence as it was submitted. In doing so, we make several observations. First, defense counsel made no issue of Hightower's "present sanity," i.e., his competency to stand trial.[9] They opposed the prosecutor's attempt to have Hightower evaluated by a state psychiatrist, and from the record, it does not appear that the State ever had him evaluated. Second, by the time of the hearing, his lawyers had engaged the services of an unnamed mental health expert, and this expert had already done some unspecified "preliminary" work on the case. Third, presumably because they had already chosen their own expert, counsel requested only that the trial court grant them <u>funds</u>. They never raised the option of an

[9]Nothing in the record indicates that Hightower's behavior at this hearing was in any way peculiar. Indeed, Hightower's competency to stand trial does not appear ever to have been at issue, a point that Hightower himself makes in his brief.

16

appointed psychiatrist. Fourth, unlike in <u>Ake</u>, in which the trial court was so concerned about the defendant's peculiar behavior that he ordered a psychiatric examination <u>sua sponte</u>, neither the court, the prosecutor, nor defense counsel ever made an issue of Hightower's behavior at the hearing.[10] Fifth, defense counsel failed to offer any fact bearing upon Hightower's mental status apart from the mere occurrence of the crime itself. At the hearing, they merely pointed out that Hightower was accused of three "abhorrent" murders even though his behavior had never before been violent or "erratic."

Based upon these observations, we conclude that Hightower had at this stage failed to satisfy his preliminary burden under <u>Ake</u>. The trial court had no evidence upon which to conclude that his "sanity at the time of the offense [was] to be a significant factor at trial." <u>Ake</u>, 470 U.S. at 83, 105 S. Ct. at 1096. Despite this, the court gave his attorneys precisely the sum they requested for a psychiatric expert. No constitutional error had yet occurred.

---

[10]Nor has Hightower argued to us on appeal that his behavior should have given the trial court pause.

b.

As far as the record discloses, it was not until some three months later that the trial court dealt in any way with defense counsel's requests for expert psychiatric assistance. In an order dated November 25, 1987, the court, citing its authorization of $750 for the payment of a psychiatric expert, ordered the county to pay $440 to Dr. N. Archer Moore. Attached to the order is an itemized billing record detailing services Dr. Moore rendered in Hightower's case, which were as follows: (1) a one-hour interview with Hightower on August 25, 1987; (2) a two-hour interview with Hightower on August 28, 1987; (3) a two-hour interview with Hightower on August 31, 1987; (4) a one-hour interview with Hightower on November 16, 1987; and (5) a two-hour conference with Hightower's attorneys on November 17, 1987.

At this point, the court could discern the following. First, defense counsel had taken a portion of the funds they had received and used it to employ an expert of their choice, Dr. Moore. Second, Dr. Moore was a psychologist, not a psychiatrist.[11] Third, Dr. Moore had taken the opportunity to evaluate Hightower

---

[11]The November 25 order does not identify this fact, though Dr. Moore's attached billing statement (1) recited his professional name as "N. Archer Moore, Ph.D.," (2) gave no indication that Dr. Moore possessed a medical degree in addition to his Ph.D., and (3) listed a single professional affiliation, the American Board of Psychology. The court from these facts alone could have assumed that Dr. Moore was a psychologist.

on four separate occasions for a total of six hours. Fourth, defense counsel had not yet exhausted the $750 that they had received for the specific purpose of hiring a psychiatric expert.

No additional funds were requested at this stage, and no error had yet occurred.

c.

Another three months passed before defense counsel presented the trial court with any additional information regarding a need for expert psychiatric assistance. On February 8, 1988, they filed a motion, which reads as follows:

Motion for Additional Funds to Hire Psychiatrist

1. On August 31, 1987, this Court granted the Defendant the sum of Seven Hundred Fifty ($750.00) [sic] to hire a psychologist and/or psychiatrist to evaluate the Defendant herein.

2. Defendant's counsels retained Dr. Archer Moore, of Macon, Georgia, to evaluate the Defendant. On the advise [sic] of Dr. Moore, Defendant's counsels were advised to seek a psychologist or psychiatrist who had extensive experience in dealing with family violence to evaluate the Defendant.

3. Dr. Emanuel Tanay, M.D., has been contacted by Defendant's counsel and has advised us that he would be able to provide forensic psychiatric services to Defendant. A copy of a letter from Dr. Tanay and a copy of his vitae is attached hereto as Exhibit "A" and is made a part hereof by reference.

4. Defendant requires the services of Dr. Tanay, if he is to adequately present not only his defense but to assist Defense counsel in the preparation of Defendant's case in the guilt/innocence phase as well as in the sentencing phase. To deny these services is to violate Defendant's constitutional rights under the Constitutions of the United States and the State of Georgia.

WHEREFORE, Defendant herein moves that this Court order that Dr. Tanay [sic] services be ordered and that this Court sign an order providing that his services would be reimbursed up to Six Thousand ($6,000.00) Dollars.

This 8th Day of February, 1988.
/s/     Hulane E. George

        B. Carl Buice

The first attachment to the motion was a letter to defense counsel from Dr. Emanuel Tanay, M.D., dated February 1, 1988. In this letter, Dr. Tanay, writing in response to an "extensive telephone conference" with defense counsel, expressed his willingness "to provide forensic psychiatric services" for Hightower at a reduced rate of $150.00 per hour plus expenses. Dr. Tanay estimated that his evaluation of Hightower would take at least twenty hours, and said that he required a court order to guarantee that he would be paid on an hourly basis for his testimony. In closing, Dr. Tanay stated that he could not evaluate Hightower before April 11, 1988.[12]

---

[12]Although it does not appear that a trial date had yet been set, the court and the parties seemed at that point to have contemplated a trial in mid- to late-April 1988.

The second attachment to the motion was Dr. Tanay's curriculum vitae. It showed, among other things, that Dr. Tanay was a psychiatrist licensed in Michigan, Ohio, and Georgia, and that he was certified by the American Board of Psychiatry and Neurology and by the American Board of Forensic Psychiatry. In addition, the curriculum vitae listed Dr. Tanay's numerous publications, some of which appeared by their titles to address legal issues related to insanity, mental illness, forensic psychiatry, and psychic trauma.

The trial court held a hearing on defense counsel's motion on February 9, 1988. At the hearing, counsel informed the court of the following:

> We have had Mr. Hightower evaluated by our psychiatrist, Dr. Archer Moore, and he advised us that we really needed someone who was an expert in family violence. And we have combed the United States, and we have been advised that this man—if you will look at his eight page vitae which is just a part of his vitae, you can see he is very well qualified. I spoke to Dr. Tanay and as he said in his letter, he could not evaluate Mr. Hightower until April the 11th of 1988, and he states that he will reduce his regular fee to $150 per hour plus expenses. His expenses includes [sic] coming from Detroit to Atlanta and renting a car. I figure probably somewhere around $6,000 for total expenses for Dr. Tanay. We desperately need his input in this case. We need it not only in the guilt-innocent phase but we need it in the sentencing phase. We need someone to evaluate Mr. Hightower and to give us some clues as to the causes of this tragedy. And he seems—according to everyone that we can talk to—is just about the only one in the United States that is available.

The prosecutor responded that the court had "bent over backwards already" in meeting Hightower's requests for psychiatric assistance, and had "gone further than Ake" required in this regard. Defense counsel answered:

> We are not asking or dealing with the issue of minimum requirement of the appellate courts. We're asking for substantial justice on the part of Mr. Hightower. To use just an ordinary psychologist in a case of this sort where the issues of domestic violence, a very specialized field, are at stake is rather analagous [sic] to using a general practitioner for brain surgery. If any accused person in Mr. Hightower's situation, who had the funds to do so, were in his place, certainly a specialist of this sort would be used. The only reason for not using a specialist of this sort in this sort of case would be a lack of funds. And if Mr. Hightower is therefore refused —denied the access to this sort of specialist simply because of lack of funds, we submit that it would be tantamount to a failure of due process.

The court then asked counsel if they could cite any authority that required the provision of additional funds. They could not. Instead, they reminded the court that they had received $750 at the last hearing, and that, as they understood it, they were entitled to come to the court again "if [they] needed more." The court then asked counsel how much money it had given them "to spend at [their] discretion." Counsel answered:

> We have $5,000—$5,750. And we've divided that into Dr. Moore's bill which was I think $450 which has been paid. We had —we have hired a jury specialist and we have hired a special investigator and that will wipe out all of that money.

22

Without further argument, the court denied the motion for additional funds.[13]

We pause once again to consider whether the court committed error at this stage. We evaluate the additional evidence now available to the court and discern how it should have affected its actions. Several things are worth noting.

First, the court knew nothing of Dr. Moore's evaluation of Hightower save the dates and durations of the interviews. It was unclear at this point as to (1) whether Dr. Moore had been able to diagnose Hightower, (2) why Dr. Moore had "advised" defense counsel to seek an expert in "family violence," and (3) whether and in what phase defense counsel intended that Dr. Moore testify at trial.

Second, the court knew nothing about the probable value of Dr. Tanay's assistance. It knew only that (1) Dr. Tanay, unlike Dr. Moore, was a psychiatrist, and (2) defense counsel perceived Dr. Tanay to be an expert in the unexplained field of "family violence." Defense counsel made no issue of the former distinction,[14] but instead grasped upon the latter distinction without explaining its significance. The most the court could glean from counsel's representations was that "family violence" was a "specialty" of psychology or psychiatry dealing with

_____

[13]Again, we note that the record bears no indication that Hightower's behavior at this hearing was in any way peculiar.

[14]Because we hold that Hightower had no right to an expert under Ake, we need not decide the question of whether a criminal defendant's Ake rights are satisfied by the provision of a psychologist rather than a psychiatrist.

23

violent behavior in the context of family relationships. While a specialist of this kind might have been useful to Hightower, his attorneys essentially conceded at the hearing that their own notions of "justice," rather than the requirements of law, demanded the provision of such an expert.

Third, defense counsel provided no additional facts upon which to make an issue of Hightower's mental state. Indeed, although Dr. Moore had evaluated Hightower months beforehand, counsel still did not indicate that they would offer an insanity defense at trial.

Fourth, Hightower had not behaved peculiarly at any proceeding.

Based upon these observations, we conclude that Hightower still had not satisfied his preliminary burden under Ake. Months after they made their initial request for funds for a psychiatric expert, defense counsel still had not shown the court that Hightower's sanity was likely to be an issue at trial. That they had received expert funds in spite of this deficiency did not entitle them to more. No error had yet occurred.

### d.

The issue next arose in the context of Hightower's motion for a continuance, filed March 2, 1988. This motion contained no additional requests for funds for

psychiatric assistance. Instead, in support of the request for a continuance, the

motion offered the following information:

> Defendant has requested Dr. Emanuel Tanay to evaluate him as
> regards his defense and in the sentencing phase of this trial. Dr. Tanay
> has indicated to this Court that the first time he would evaluate
> Defendant would be on the week of April 18, 1988. Dr. Tanay would
> need time then to prepare his evaluation and discuss same with the
> defense counsel. There would not be enough time to accomplish this
> prior to the scheduled trial date. Dr. Tanay's testimony will be vital to
> Defendant's case in chief and to the sentencing phase.

On March 9, 1988, the court heard arguments on Hightower's motion. At

the hearing, defense counsel told the court that they had sought Dr. Tanay's help,

but that Hightower's family was "unable to come up with the money" to pay him.

Counsel represented that Dr. Tanay "[had] to have at least $7,000 in his hand" and

that he "[had] to have it, you know, like yesterday."[15] Counsel did not at this point

request additional funds. Rather, they offered this information in support of their

request for a continuance.

In opposing the motion for a continuance, the prosecutor argued that (1) the

court had already given defense counsel a "lump sum of money . . . a blanket

amount that could be used for anything they wanted to use it for," including expert

---

[15]In the February 8, 1988, Motion for Additional Funds to Hire Psychiatrist, as well as at
the hearing on the same motion, defense counsel had requested $6,000.00. It is unclear from the
record as to why counsel at the March 9, 1988, hearing increased to $7,000.00 their estimate of
the costs of Dr. Tanay's services.

psychiatric assistance; (2) defense counsel had not made any showing to the trial court that Hightower was "psychiatrically deprived"; and (3) as a result, defense counsel must have wanted a psychiatric expert for mitigation purposes. In any case, the prosecutor argued, defense counsel had already received "ample time" in which to secure the services of a psychiatrist.

The court denied the motion for a continuance, but said it would reconsider it if circumstances later made it appear that the trial could not proceed as scheduled.

We distill the record to its essence to determine what additional evidence the court received at this stage regarding Hightower's need for a psychiatric expert. First, counsel still tentatively planned to retain Dr. Tanay, though they were uncertain as to how they would pay him. Second, they offered no additional facts bearing upon the issue of Hightower's mental state. Third, Hightower's behavior at the pretrial proceedings remained normal. Fourth, except in contending that Dr. Tanay's testimony would be "vital" to both the guilt and sentencing phases of trial,[16] counsel had said nothing about a possible insanity defense.

Defense counsel did not at this stage request any additional funds for a psychiatric expert, and the trial court had not erred.

_____

[16]The court could have looked upon this contention dubiously, as Dr. Tanay had not yet evaluated Hightower.

26

e.

On April 15, 1988, the court held a hearing on various matters. In support of a renewed motion for a continuance, defense counsel told the court that they had "secured a psychologist who [would] be working with [them] in the preparation of [the] defense," and that this psychologist's involvement in a murder trial elsewhere in the state might cause him to miss Hightower's trial. The court denied the motion nevertheless.

Defense counsel then made a lengthy oral statement in support of their view that the court's rulings on their requests for funds for experts had rendered their assistance to Hightower ineffective as a matter of law. As for their requests for funds for psychiatric assistance, counsel stated that they had been unable to hire Dr. Tanay because of the court's denial of their February 2, 1988, motion for additional funds. In response, the prosecutor stated:

> But, Your Honor, there has been absolutely no indication on counsel's part that they intend to use insanity, a special plea of insanity, not guilty by reason of insanity or any of the other accepted defenses in this case which would even trigger the necessity of the Court appointing psychiatrists or rendering money to the defendants for a psychiatric review in this case. It is my understanding that what counsel is relying on in this case based on their statement is the mitigating circumstance testimony by a psychiatrist or a psychologist and counsel says that has been arranged.

27

At the end of the prosecutor's remarks, the court said that it would "adhere to all . . . former rulings" on the issues that defense counsel had raised. The parties then addressed other pretrial matters. As far as the record discloses, Hightower's behavior at the hearing was unremarkable.

Once again, we evaluate the evidence put before the trial court. First, defense counsel had abandoned the idea of hiring Dr. Tanay, and had instead engaged the services of another psychologist in addition to Dr. Moore. Second, counsel offered no additional facts bearing upon Hightower's mental state. Although the case was now proceeding under the new indictment,[17] and in spite of the fact that trial was set to begin in only two weeks,[18] defense counsel still had said nothing about relying on an insanity defense. Third, because they had not expressed an intention to present an insanity defense, the court could infer that at least one of the two psychologists that counsel had engaged would testify during the sentencing phase. Fourth, nothing suggested that Hightower might be incompetent to stand trial.

---

[17]See supra note 1.

[18]By letter of February 29, 1988, the court set the case for trial beginning April 28, 1988. Throughout the remainder of the pretrial stages, the court was unwilling to reconsider this trial date, even though Hightower's new indictment did not issue until March 18, 1988. In fact, trial proceedings began as scheduled on April 28, 1988, with voir dire of the jury venire. Hightower does not presently allege that the court erred in refusing to continue the trial.

The court had not yet received any indication that Hightower's sanity at the time of the offense would be an issue at trial, and had not erred.

f.

We have surveyed all pretrial proceedings at which Hightower presented the trial court with information bearing upon his need for a psychiatric expert. He has failed to identify any point in those proceedings at which the court, given the evidence then available, acted contrary to the requirements of federal law.

We are not unconcerned about putting the proverbial cart before the horse in cases of this kind. Without question, defense counsel may be unable fully to understand and explain his client's mental state until an evaluation is performed. But Ake does not require defense counsel to guide the trial court through the depths of the defendant's psyche; all it requires is a minimum threshold showing that the defendant's sanity at the time of the offense is likely to matter at trial. No such showing was made in this case.

2.

Even if we assume that Hightower made the showing Ake requires, we hold that the trial court met its constitutional obligation under Ake by providing Hightower with defense funds that could have been spent on the services of a psychiatric expert.

29

In addition to the $750 it granted specifically for a psychiatric expert, the court gave Hightower a lump sum of $5,000 for defense expenses. In Hightower's view, it would have been improper under the circumstances for his lawyers to use any portion of this lump sum for a psychiatric expert. The Georgia Supreme Court decided to the contrary on direct appeal, finding instead that Hightower could have used this lump sum "for a special investigator or other such expert assistance as [he] might choose." Hightower v. State, 386 S.E.2d 509, 511 (11th Cir. 1989). This finding of fact is entitled to a presumption of correctness, one that Hightower can rebut only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The thrust of Hightower's argument before us is that the court awarded the lump sum specifically in response to counsel's requests for funds for nonpsychiatric experts, i.e., demographers, jury specialists, and special investigators. Hightower points to the following exchange that took place between defense counsel and the court at the pretrial hearing on August 31, 1987:

THE COURT: All right. How much money are you asking for insofar as the special investigator is concerned?

MS. [sic] BUICE: Your Honor, I think that what we would like to have would be a sum of $5,000 to be able to proportion this between an investigator as well as a jury specialist. I had contacted a jury specialist and they have not called me back at this point. I

30

|  |  |
|---|---|
|  | believe the last information I got their fee was somewhere around $2,500, $1,500 to $2,500. |
| THE COURT: | Well, I am going to deny your motion for a jury selection specialist. I am going to deny your motion for a demographer. What else did you ask for? |
| MS. GEORGE: | Special Investigator. |
| THE COURT: | I am going to grant your motion for a special investigator and authorize you to expend up to $5,000. Now, I am not going to require you to—if you want to spend your $5,000, part of it on a jury selection specialist, that's up to you. I'm just not going to provide any further compensation beyond the $5,000 without an additional hearing. |

According to Hightower, this dialog definitively establishes an understanding between his attorneys and the court that the $5,000 lump sum could be used for an investigator and a jury consultant, but not for any other purpose.[19] We disagree. Whatever one might conclude from reading this dialog in isolation, the record taken as a whole amply supports the supreme court's finding. First, at the hearings on February 9, 1988, March 9, 1988, and April 15, 1988, counsel referred to their defense funds as discretionary.[20] Second, Hulane George testified

---

[19]Unfortunately, the parties have not cited, and we cannot find, any written embodiment of the court's order regarding the $5,000 lump sum.

[20]At the hearing on February 9, 1988, when defense counsel requested additional funds for a psychiatric expert, the court asked for a reminder of the sum it had already granted counsel "to spend at [their] discretion." They answered: "We have $5,000—$5,750. And we've divided

31

before the Butts County Superior Court that she and Buice "could [have] allocate[d] [the $5,000] however [they] wanted."

Third, the record shows that counsel <u>actually used a portion of the $5,000 lump sum to pay for the services of a psychologist who testified on Hightower's behalf at trial</u>. Dr. Howard Albrecht, Ph.D., testified for the defense during the sentencing phase of the trial.[21] After the trial concluded, George prepared,[22] and the court signed, an order for payment of Dr. Albrecht's services, which we reproduce here:

---

that into Dr. Moore's bill which was I think $450 which has been paid. We had—we have hired a jury specialist and we have hired a special investigator and that will wipe out all of that money." At the March 9, 1988 hearing, counsel told the court that it had given them "$5,000 to spend any way [they] wanted to and $750 for a psychiatric evaluation." At the April 15, 1988 hearing, counsel said that the court had given them "$5,000 for [a special investigator] and all other experts [they] wished to hire to assist [them]."

[21]Throughout the record, confusion abounds as to the correct spelling of Dr. Albrecht's name. The index of the trial transcript, which includes the names of all testifying witnesses, lists him as "Dr. Harold Allbright." According to the transcript of his direct testimony, on the other hand, he at trial stated his name as "Howard Edward Allbright." Finally, the "Order for Payment of Psychological Evaluation" of May 17, 1988, matches how his name is printed on his attached letterhead invoice: "Howard E. Albrecht." We find the letterhead and accompanying motion most likely to be accurate and adopt his name as it is spelled there.

Lest we be concerned that there were 2 different psychologists with strikingly similar names (an unlikely scenario that would nonetheless wreak havoc with our reasoning regarding the May 17, 1988 order), we note that Dr. Albrecht's letterhead invoice, as well as the transcript of his trial testimony, both reflect the same practice location (Decatur, Georgia) and Georgia license number (748).

[22]The bottom left corner of the motion actually bears the mark of defense counsel's law firm: "Waddell, Emerson, George & Buice, Attorneys at Law, P.O. Drawer 630, Milledgeville, Georgia, 31061."

32

## ORDER FOR PAYMENT OF PSYCHOLOGICAL EVALUATION

This Court having found the above-named Defendant indigent, and,

HAVING ORDERED on August 31, 1987, the payment of Five Thousand ($5,000.00) Dollars for costs incurred in the defense of the above-styled case and the attached invoice in the amount of One Thousand ($1,000.00) Dollars being received from Dr. Howard Albrecht, Ph.D.;

IT IS HEREBY ORDERED that the County Commissioners of Baldwin County, Georgia pay over to said Dr. Howard Albrecht the sum of One Thousand ($1000.00) Dollars on the behalf of John Hightower, indigent.

This 17th Day of May, 1988.


/s/     William A. Prior, Jr., Judge
        Baldwin County Superior Court

This Order prepared by:

Hulane E. George
MILLEDGEVILLE, GEORGIA 31061

Attached to the order is Dr. Albrecht's "Invoice for Professional Services," addressed to defense counsel and dated May 18, 1988.[23]  Without itemizing costs, the invoice merely recites a balance due of $1000 for "Forensic Psychological Consultation on the John Hightower case."  Thus, defense counsel not only understood that they could use the $5,000 lump sum for a psychiatric expert—they

---

[23]We cannot tell why the order predated by 1 day the invoice that it purported to pay.

33

actually <u>did</u> in the case of Dr. Albrecht, a psychologist who, like Dr. Moore, they had chosen themselves.[24]

The record is therefore replete with evidence showing that defense counsel could, and in fact did, pay for a psychiatric expert out of the $5000 lump sum the trial court granted for defense expenses.

<u>Ake</u> makes clear that no criminal defendant "has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." 470 U.S. at 83, 105 S. Ct. at 1096. To the extent that Hightower claims the trial court should have granted him funds sufficient to hire Dr. Tanay, therefore, he is mistaken. In giving Hightower $5,750 in discretionary defense funds, the court went further than <u>Ake</u> requires. There was no error.

B.

---

[24]The Georgia Supreme Court in its opinion on direct appeal stated: "[T]he defendant retained the services of a psychologist who testified at trial. The court authorized an additional $1,000 to pay for the services of this psychologist." <u>Hightower v. State</u>, 386 S.E. 2d 509, 511 (Ga. 1989). This statement mischaracterizes the record. In fact, 2 psychologists testified at trial: Dr. Moore (during the guilt phase) and Dr. Albrecht (during the penalty phase). Dr. Moore was paid $440 by order of November 25, 1987, out of the $750 the judge granted at the hearing on August 31, 1987. Dr. Albrecht, on the other hand, was paid $1,000 by order of May 17, 1988, out of the $5,000 lump sum.

Hightower also claims that the trial court violated his due process rights under <u>Ake</u> by permitting the prosecutor to attend and participate in hearings on his requests for funds for psychiatric experts. In Hightower's view, <u>Ake</u> demands that such hearings be conducted <u>ex parte</u>. Because Hightower raised this claim unsuccessfully on direct appeal to the Georgia Supreme Court, our review is once again limited by 28 U.S.C. § 2254(d).[25]

This issue first arose at the hearing on August 31, 1987, when defense counsel argued their August 6, 1987 "Motion for Funds to Hire Independent Psychiatrists." Citing <u>Ake</u>, they argued that they were entitled to present this motion "without either the presence or participation of the [prosecutor]." The court rejected this interpretation of <u>Ake</u> and permitted the prosecutor's presence at this and every subsequent hearing at which counsel requested funds for a

psychiatric expert.[26]

_____

[25]Although the Georgia Supreme Court disposed of this claim without extended discussion, <u>Hightower v. State</u>, 386 S.E.2d 509, 511 (1989) ("The defendant has not shown any harm from the denial of an <u>ex parte</u> hearing on the funds issue."), we agree with the district court that this claim was "adjudicated on the merits in State court proceedings" so as to trigger the provisions of 28 U.S.C. § 2254(d).

Hightower also raised this claim before the state habeas court, but that court did not address it.

[26]Upon considering defense counsel's <u>Ake</u> arguments at this hearing, the judge stated: "Well, I don't think—I don't think the word '<u>ex parte</u>' necessarily means the district attorney can't physically be present. I think it just simply means he can't participate." Hightower claims

In support of his claim, Hightower points to the following language in Ake: "When the defendant is able to make an ex parte threshold showing to the trial court that his sanity is likely to be a significant factor in his defense, the need for the assistance of a psychiatrist is readily apparent." 470 U.S. at 82-83, 105 S. Ct. at 1096. Hightower has expended substantial effort in seeking to convince us that the Supreme Court, through this single sentence, incorporated the ex parte requirement into Ake's central holding. This effort is misdirected. Since Hightower raised this claim on direct appeal, we focus upon how the Georgia Supreme Court disposed of it, rather than how we would dispose of it on first impression.

The supreme court held simply that Hightower "[had] not shown any harm from the denial of an ex parte hearing on the funds issue." Hightower v. State, 386 S.E.2d 509, 511 (Ga. 1989). Thus, the court, which cited no authority in support of its holding, did not in this case pass directly on the question of whether Ake

---

that the court, in spite of this interpretation, permitted the prosecutor to "participate actively" at this and every hearing at which his attorneys requested funds for a psychiatric expert. While this may be true, we do not view the presence/participation distinction as controlling in this particular case. Hightower does not merely claim that the court misapplied the correct standard, i.e., that his rights would have been adequately protected had the prosecutor been permitted to attend these hearings without participating. Rather, the thrust of Hightower's argument to us is that the prosecutor's mere presence at these hearings prejudiced his right to prepare his defense in secret.

   Although defense counsel raised their ex parte objection at the August 31, 1987 hearing, it does not appear from the record that they raised the objection at any later hearing. No court to date has addressed whether Hightower thereby waives for purposes of appeal any errors occurring at these later hearings. We reject his claim on the merits without deciding this issue.

36

requires ex parte hearings.[27]  Instead, the court, in our understanding, held that even

if Hightower had a right to be heard ex parte, he suffered no prejudice from the

denial of this right.  It is implicit in this reasoning that the right that Hightower

claims, if it even exists, is subject to a harmless error analysis.  Viewed in this light,

his ex parte claim fails both in principle and in application.

First, Hightower has not shown that the supreme court committed legal error

in implicitly holding that the denial of ex parte hearings can be harmless.  We

express no opinion as to whether this holding is correct.[28]  Our review is instead

limited to whether this holding was contrary to or an unreasonable application of

the clearly established precedent of the Supreme Court of the United States.  We

---

[27]Interestingly, 1 month before rendering its judgment in Hightower's case, the supreme court held in Brooks v. State, 385 S.E.2d 81, 84 (Ga. 1989), that an indigent criminal defendant's requests for funds for expert assistance should be heard ex parte.  But the court did not base its holding upon the language of Ake.  On the contrary, it stated that "[t]he Ake holding does not clearly mandate that [such] hearing[s] be ex parte."  Id. at 83.  Hightower cries foul from the fact that the supreme court did not refer to Brooks when it addressed his ex parte claim.  But Brooks is unhelpful to Hightower at this stage, as the plain language of that opinion states that Ake does not require ex parte hearings.  Whatever the reason for the court's failure to apply Brooks to Hightower's case, we are unconcerned in a federal habeas proceeding with errors of state law.  As we go on to discuss, the supreme court did not run afoul of federal law in disposing of Hightower's ex parte claim.

[28]We recently decided in Hicks v. Head, 333 F.3d 1280, 1287 (11th Cir. 2003), that Ake errors are subject to harmless error analysis.  Our opinion dealt with the trial court's denial of psychiatric assistance, rather than with its failure to conduct ex parte hearings on requests for such assistance.  We need not decide whether our opinion in Hicks applies with equal force to the latter issue.  Rather, we need only determine whether the Georgia Supreme Court failed to conform to clear United States Supreme Court precedent existing at the time of its decision.

hold that it was not. Hightower does not cite, and we cannot find, any clear

Supreme Court precedent stating that the denial of ex parte hearings on requests for

expert psychiatric assistance is beyond harmless error analysis.

Second, Hightower has not shown that the Georgia Supreme Court erred on

the question of prejudice. He contends that, as a result of the trial judge's refusal to

conduct ex parte hearings on his requests for expert psychiatric assistance, the

prosecutor became privy to defense strategies and to potential weaknesses in the

defense's case.[29] Specifically, he asserts that his attorneys were forced to disclose

that Dr. Moore had "declared himself unqualified" to offer a diagnosis, and were

required to "provide an accounting" of the funds they had spent in his defense. The

record betrays these assertions. Counsel never revealed that Dr. Moore was

"unqualified"; they merely told the court at the February 9, 1988 hearing that Dr.

Moore "advised [them] that [they] really needed someone who was an expert in

family violence." This mirrors the representation they made in their motion of

---

[29]Hightower also notes that, because the trial judge failed to conduct ex parte hearings, the prosecutor gained the ability to contest his attorneys' requests for funds for a psychiatric expert. To the extent he contends that he was in this way prejudiced, we disagree. The trial judge is ultimately responsible for the decision of whether to award expert funds. The prosecutor's arguments only matter insofar as the court accepts them. We address in Part III.A the question of whether the judge erred in refusing to grant Hightower's requests for funds.

February 8, 1988, which they served upon the prosecutor.[30] Furthermore, the court

never demanded at these hearings that the attorneys provide an "accounting" of the

funds they had spent. Instead, in support of their requests for additional funds

counsel merely volunteered that they had already earmarked their existingfunds.[31]

We cannot say that Hightower suffered prejudice as a result of this disclosure.

---

[30]The relevant part of this motion, styled "Motion for Additional Funds to Hire Psychiatrist," reads as follows:

> Defendant's counsels [sic] retained Dr. Archer Moore, of Macon, Georgia, to evaluate the Defendant. On the advise [sic] of Dr. Moore, Defendant's counsels were advised to seek a psychologist or psychiatrist who had extensive experience in dealing with family violence to evaluate the Defendant.

[31]At the close of the February 9, 1988 hearing, the judge asked, "How much money did I give you to start to spend at your discretion?" Defense counsel answered:

> We have $5000—$5750. And we've divided that into Dr. Moore's bill which was I think $450 which has been paid. We had—we have hired a jury specialist and we have hired a special investigator and that will wipe out all of that money.

Without further argument from either party, the court denied the motion for additional funds. Thus, the court at this hearing merely asked for a reminder of the total sum it had already granted to the defense, rather than an accounting of how the money had been spent. Defense counsel of their own accord stated that they had already committed all of their funds, but they did not itemize their commitments.

At the March 9, 1988 hearing, defense counsel, in presenting their motion for a continuance, told the court that they had spent $450 of the $750 it had granted them for a psychiatric expert. (In fact, counsel had spent $440, not $450.) This disclosure revealed nothing more than what was stated in the court's order of November 25, 1987, which authorized payment for Dr. Moore's services.

At the April 15, 1988 hearing, defense counsel, in their lengthy oral statement to the court, noted that they had received defense funds totaling $5,750. They did not discuss how they had spent that money. Although the clear implication was that they would certainly exhaust this sum, counsel had already said as much at the February 9 hearing. More important, counsel offered this statement at their own behest. The court made no request that they account for the funds they had spent.

To maintain absolute secrecy, Hightower's attorneys could have filed their Ake motions under seal and requested that they be reviewed in camera.[32] But as the matter stands before us, given our narrow scope of review under 28 U.S.C. § 2254(d), there is no basis upon which to upset the decision of the Georgia Supreme Court. We therefore proceed to a discussion of Hightower's remaining claims.

## IV.

Hightower next claims that the prosecutor used his peremptory strikes during jury selection in a racially discriminatory manner, in contravention of Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). The Georgia Supreme Court rejected each of his Batson claims on direct appeal. Hightower v. State, 386 S.E.2d 506, 512 (Ga. 1989). Thus, our review is again limited by 28 U.S.C. § 2254(d). We find this claim to be without merit.

## A.

We begin our analysis of this claim by describing the process by which the jury was selected. Voir dire was conducted on Thursday, April 28, and Friday, April 29, 1988. The court summoned a total of seventy-three venirepersons for Hightower's case, but had them appear in three groups: one on Thursday morning,

---

[32]Hightower does not contend that his attorneys were ineffective for failing to do so.

40

one on Thursday afternoon, and one on Friday morning. The court began the voir

dire process by first assembling each group in the courtroom en masse. After it

made introductory remarks to the group, the court gave some preliminary

instructions and administered oaths.[33] The court then delegated to the prosecutor

the duty of propounding the "statutory voir dire" questions specified by Georgia

law.[34] After ensuring that the entire group was statutorily qualified, the court

directed the clerk to call the venirepersons to the jury box twelve at a time for

---

[33]The oaths obligated the venirepersons to tell the truth under penalty of perjury to the questions put to them.

[34]O.C.G.A. § 15-12-164 requires that all venirepersons be asked 4 specific questions. These are: (1) "Have you, for any reason, formed or expressed any opinion in regard to the guilt or innocence of the accused?"; (2) "Have you any prejudice or bias resting on your mind either for or against the accused?"; (3) Is your mind perfectly impartial between the state and the accused?"; and (4) "Are you conscientiously opposed to capital punishment?". The prosecutor asked a form of these questions to each group en masse, rather than to each individual venireperson. Under Georgia law, the trial judge may give the prosecutor the duty of asking the statutory voir dire questions. Hicks v. State, 207 S.E.2d 30, 35-36 (Ga. 1974). It was altogether proper under Georgia law to ask these questions to each group of venirepersons en masse, rather than individually or in panels of twelve. Ivester v. State, 313 S.E.2d 674, 676 (Ga. 1984).

further questioning by the parties.[35]  They were called in the same order as they were called when the clerk took the roll after they had reported for jury duty.[36]

Before the parties examined those in the jury box, the court asked them to state their names, addresses, workplaces, and their spouses' names and workplaces. The prosecutor and defense counsel then proceeded with their questioning.  After counsel finished, the court permitted the parties to question individually and out of the presence of all other venirepersons anyone whose  views on the death penalty appeared (to the parties) to be constitutionally problematic.[37]  This process was

---

[35]O.C.G.A. § 15-12-131 provides that "it shall be the duty of the court, upon the request of either party, to place the jurors in the jury box in panels of 12 at a time, so as to facilitate their examination by counsel."  This enables counsel to make an informed decision in exercising peremptory challenges and in obtaining grounds for a challenge for cause.  O.C.G.A. § 15-12-133 provides that "[i]n all criminal cases[,] both the state and the defendant shall have the right to an individual examination of each juror from which the jury is to be selected prior to interposing a challenge."

[36]Since the venirepersons were called into the jury box in panels of 12, there always remained a group of venirepersons left over from the larger group assembled en masse.  It appears that those left over remained in the courtroom and observed the parties' voir dire of the 12-person panels.

[37]Under Georgia law, "[t]he [trial] court has discretion in determining whether or not sequestered examination should be granted in a particular case."  Ivester, 313 S.E.2d at 675.  At a hearing held on the eve of trial, April 27, defense counsel presented evidence in support of a motion for individual and sequestered voir dire.  The court denied this motion as to the venire as a whole, but said that it would permit individual and sequestered voir dire of those who (1) expressed views on the death penalty sufficient to raise a question as to their qualification for service on the petit jury, or (2) stated that they had previously heard about the case.

Before counsel conducted their individual, sequestered void dire of a panel member, the court cleared the courtroom of the rest of the venire, including those on the panel whom the parties expressed no desire to question individually and under sequestration.

repeated throughout the day on Thursday and through the early afternoon on Friday. In the end, the parties examined on voir dire six panels, five consisting of twelve persons, and one consisting of thirteen.[38]

The court entertained challenges for cause in two ways. The court heard challenges to those who were questioned individually and out of the presence of all other venirepersons immediately after each was examined. The prosecutor challenged four, and the court excused them. Defense counsel challenged one venireperson, to no avail. The court handled the remaining challenges for cause following the parties' examination of the respective twelve-person panels. The court did so in open court and in the presence of the entire venire, while the panel was in the jury box. Those excused promptly left the courtroom.

Fifty-nine venirepersons were qualified for service on the petit jury.[39] These qualified jurors assembled in the courtroom on Friday, April 29, at 4 P.M. The court informed them that the parties would choose the petit jury the following

---

[38]The court sat 13 venirepersons on the sixth panel to accommodate all venirepersons who remained at that point.

[39]O.C.G.A. § 15-12-160 provides that "in any case in which the state announces its intention to seek the death penalty, the court shall have impaneled 42 jurors from which the defense and state may strike jurors." Thus, more jurors were qualified in this case than Georgia law requires.

Monday, May 2, at 9 A.M. It asked them all to return to the courtroom at that time, prepared to serve on the petit jury for up to three days, if necessary.[40]

On Monday, May 2, the parties selected the petit jury from the fifty-nine qualified jurors. Defense counsel had twenty peremptory strikes, and the prosecutor ten.[41] The clerk called the names of the jurors individually, in the order in which they had been called (and ushered into the jury box in the panels of twelve) during voir dire. Each prospective juror was first placed upon the prosecutor, who either excused (by means of a peremptory strike) or accepted him. Jurors accepted by the prosecutor were placed upon defense counsel, and if accepted by them, were empaneled.[42] This process continued until the full petit jury of twelve was chosen.[43]

---

[40]Once selected, the jury was sequestered for the duration of the trial.

[41]O.C.G.A. § 15-12-165 provides that "in any case in which the state announces its intention to seek the death penalty, the person indicted for the crime may peremptorily challenge 20 jurors and the state shall be allowed one-half the number of peremptory challenges allowed to the accused."

[42]O.C.G.A. § 15-12-166 provides that "[i]f a juror is found competent and is not challenged peremptorily by the state, he shall be put upon the accused. Unless he is challenged peremptorily by the accused, the juror shall be sworn to try the case."

[43]Of the 12 jurors who were empaneled, 9 were white and 3 were black.

The parties then selected two alternate jurors.[44]  As to these, defense counsel had four peremptory strikes, and the prosecutor had two.[45]  The clerk called the prospective alternate jurors from the same list as before, beginning with qualified juror number forty-three.

In the selection of the jury of twelve, the prosecutor used seven of his ten peremptory strikes, six against African-Americans.  In the selection of the alternates, he used both of his strikes, one against an African-American. Immediately after each African-American was struck, defense counsel noted the juror's race for the record and informed the court that they wished to lodge a Batson objection.  The court stated that it would consider counsel's objection after the parties had exercised their peremptory challenges and a jury of twelve and two alternates had been selected (but not sworn).  When this was done, the court sent the jurors to the jury room, instructing them not to discuss the case, and directed the remaining qualified jurors to sit in the hallway outside of the courtroom.

---

[44]O.C.G.A. § 15-12-168 permits a trial court to seat "one or more" alternate jurors in any felony trial that "is likely to be a protracted one."

[45]O.C.G.A. § 15-12-169 provides that "[t]he state shall be entitled to as many peremptory challenges to alternate jurors as there are alternate jurors called," and that "[t]he defendant shall be entitled to additional peremptory challenges in an amount twice greater than the additional peremptory challenges of the state."

Defense counsel then made their objections. Noting that Hightower was African-American, they contended that they had established a prima facie <u>Batson</u> violation because the prosecutor had purposefully struck members of Hightower's race on account of their race. In support of their claim that the prosecutor's conduct gave rise to an inference of racial discrimination, counsel advanced two lines of argument. First, they pointed out that in selecting the jury of twelve, the prosecutor used six of his seven strikes to exclude African-Americans. Second, they represented that the prosecutor had "in the past shown a bent and scheme to keep down the low number of blacks on either the grand jury or regular panels." Counsel presented a newspaper article about <u>State v. Amadeo</u>, a case which, they claimed, "arose out of a memo which has been attributed to Mr. Briley," the prosecutor, and which detailed "a purpose and a plan" to limit the number of

African-Americans serving on grand juries.[46] Taken as a whole, counsel claimed, these facts were sufficient proof that the prosecutor had discriminated.

The prosecutor denied any attempt to "stack the jury" racially. The court nonetheless required him to give a reason for each of his strikes of African-Americans.[47] We recount his responses here.

Ricky Thomas. The prosecutor stated that Mr. Thomas's father had been convicted for killing Mr. Thomas's mother, but had later returned home to raise his children. The prosecutor feared that Mr. Thomas would "identify" the instant case with his father's. Specifically, the prosecutor felt that Mr. Thomas would give

---

[46]Roughly 1 month after Hightower's trial, the Supreme Court handed down its decision in Amadeo v. Zant, 486 U.S. 214, 108 S. Ct. 1771, 100 L. Ed. 2d 249 (1988). The Court held that the petitioner in that case had "established cause for his failure to raise in the state trial court a constitutional challenge to the composition" of his grand and petit juries. Id. at 216-17, 108 S. Ct. at 1774. Specifically, the Court noted that while the petitioner was pursuing a direct appeal in state court, an "independent civil action in federal court [had] brought to light a scheme" initiated by the Putnam County District Attorney to "underrepresent black people and women on the master jury lists." Id. at 217, 108 S. Ct. at 1774. The Court in its opinion did not provide the names of the individuals in the DA's office who were responsible for creating the memorandum that expressed this scheme. But some 3 years later, in Horton v. Zant, 941 F.2d 1449, 1455-56 (11th Cir. 1991), we noted that Hightower's prosecutor, Joseph Briley, had admitted to being the author of the memorandum.

[47]The court required the prosecutor to explain why he struck an African-American in selecting the 2 alternate jurors even though defense counsel, in articulating their Batson objections, said nothing about the prosecutor's exercise of that strike. In Hightower's brief to us, the prosecutor's striking of this proposed alternate juror does not appear to be part of Hightower's Batson claim.

undue thought to "what his father has meant to him since he [came] home," and would presumably be lenient with Hightower as a result.

Lucious Boswell. The prosecutor stated that Mr. Boswell (1) was the brother of the wife of Walter Davis, whom the State had prosecuted for cocaine trafficking and RICO violations, and (2) had indicated that a convicted murderer should "work [his punishment] out in prison," rather than suffer a death sentence.

Mattie Pearl Harris. The prosecutor stated that Ms. Harris (1) "expressed uncertainty" about her willingness to vote for a death sentence, (2) had a son who had been imprisoned frequently, (3) had a daughter who had served a drug-related prison sentence, and (4) had been forced to care for her daughter's children during the latter's prison sentence.

Norman Jonathan Mack. The prosecutor stated that Mr. Mack had "contradicted himself on the death penalty" during voir dire, once stating that he was "conscientiously opposed," and later softening that stance. The prosecutor felt he could not determine with sufficient certainty the scenarios in which Mr. Mack would be inclined to vote for a death sentence.

Thelma Butler. The prosecutor stated that Ms. Butler was the sister of the wife of Gerald Veasley, whom he had prosecuted to a conviction for aggravated battery.

48

Emerson Davis, Jr.  The prosecutor stated that Mr. Davis had appeared "somewhat [more] opposed to the death penalty" than other prospective jurors.

Lynette Davis (prospective alternate).  The prosecutor stated that Ms. Davis (1) had an uncle whom the prosecutor's office had recently convicted for burglary, and (2) was lukewarm on the death penalty.

After this, the court ruled.  First, it declined to admit into evidence the newspaper article that defense counsel had submitted in support of their motion. Second, the court ruled that counsel had failed to make a prima facie case of discrimination, and alternatively, that the prosecutor had "presented an articulable, nonrace related reason for striking" each prospective black juror, thereby defeating the claim of discrimination.

B.

In Batson, the Supreme Court held that the State, in the person of the prosecutor, violates the Equal Protection Clause of the Fourteenth Amendment by striking jurors peremptorily on account of their race.  476 U.S. at 89, 106 S. Ct. at 1719.  The Court established the  mechanism for proving such violations.  To make a prima facie case of discrimination,

> the defendant first must show that he is a member of a cognizable
> racial group, and that the prosecutor has exercised peremptory
> challenges to remove from the venire members of the defendant's race.

> Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

Id. at 96, 106 S. Ct. at 1723 (citation and marks omitted). The trial judge "should consider all relevant circumstances" in deciding whether the defendant has made a prima facie case. Id. at 96-97, 106 S. Ct. at 1723.

After the defendant has made a prima facie case, the state must "come forward with a neutral explanation for challenging black jurors." Id. at 97, 106 S. Ct. at 1723. The Court has not stated with specificity what sort of explanation will suffice. While the prosecutor may not strike a juror simply on the assumption that "jurors of the defendant's race . . . would be partial to the defendant because of their shared race," he is not required to give an explanation that "rise[s] to the level justifying exercise of a challenge for cause." Id. Finally, the judge must decide whether the prosecutor purposefully discriminated against jurors on account of their race through the use of peremptory strikes. Id. at 98, 106 S. Ct. at 1724. The defendant carries the ultimate burden of persuasion on this issue. Purkett v. Elem, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771, 131 L. Ed. 2d 834 (1995).

With these principles as background, the Georgia Supreme Court on direct appeal rejected Hightower's <u>Batson</u> claim. "Even assuming [that Hightower] made out a prima facie case" of discrimination, the court held, the trial judge "was not clearly erroneous" in finding "that the prosecutor had articulated legitimate non-racial reasons for his challenges," and that the prosecutor had not in fact discriminated. <u>Hightower v. State</u>, 386 S.E.2d 509, 512 (Ga. 1989). Given our constraints under 28 U.S.C. § 2254, we find no basis upon which to disturb the supreme court's judgment.

We will assume for purposes of argument (as the supreme court did) that Hightower established a prima facie case of discrimination, thereby satisfying <u>Batson</u>'s first step.[48] We proceed to the second step of the <u>Batson</u> analysis to consider whether the prosecutor met his burden of production. The Supreme Court

---

[48]We note that the courts that have decided this question have taken different approaches. The trial court, as we state in Part IV.A, held that Hightower failed to make a prima facie case, but that in any event, the prosecutor's race-neutral explanations for his strikes were sufficient to prevent Hightower from carrying his ultimate burden of persuasion. On direct appeal, the supreme court assumed without deciding that Hightower had made a prima facie case, but found no error in the trial judge's ultimate findings that the prosecutor (1) stated legitimate reasons for his strikes, and (2) had not discriminated. <u>Hightower v. State</u>, 386 S.E.2d 509, 512 (1989). The district court agreed with the trial judge that Hightower had failed to establish a prima facie case, and thus disposed of the claim without discussing the second or third steps of the <u>Batson</u> analysis. The district court's approach therefore differed from that taken by the supreme court.

Mindful of our role in habeas proceedings, we focus our analysis upon the correctness of the supreme court's judgment. That court assumed that Hightower had made out a prima facie case, but denied his claim nonetheless. Our task is to consider whether this judgment "was contrary to, or an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d).

has held that <u>Batson</u>'s "second step . . . does not demand an explanation that is persuasive, or even plausible. At this second step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." <u>Purkett</u>, 514 U.S. at 768, 115 S. Ct. at 1771 (citation, marks and brackets omitted). Based upon our review of the record, we cannot say that the Georgia courts erred in finding that the prosecutor satisfied this minimal burden of production. The prosecutor gave specific, nonracial reasons for each of his strikes of African-Americans: some struck jurors were related to persons he had prosecuted or convicted, while others appeared to him to be uncomfortable with rendering a death sentence. Such explanations fall well within the boundaries set by <u>Batson</u> and its progeny. <u>Compare Purkett</u>, 514 U.S. at 769, 115 S. Ct. at 1771 (holding that the prosecutor satisfied his burden of production merely by expressing his discomfort with the struck black juror's long, unkempt hair, mustache, and beard), <u>with</u> <u>United States v. Horsley</u>, 864 F.2d 1543, 1546 (11th Cir. 1989) (holding that the prosecutor failed to satisfy his burden of production when he stated that he struck a black juror because he "just got a feeling about him").

Proceeding to the third and final step of the Batson analysis, we accept the finding of the Georgia courts that Hightower failed to "establish[] purposeful discrimination." Batson, 476 U.S. at 98, 106 S. Ct. at 1724. Our judgment is informed in great part by our recognition of the trial court's superior position to observe the prosecutor's "credibility" and "demeanor," factors that bear strongly upon the ultimate question of whether the prosecutor discriminated. Miller-El v. Cockrell, 537 U.S. 322, 338-39, 123 S. Ct. 1029, 1040, 154 L. Ed. 2d 931 (2003); see Eagle v. Linahan, 279 F.3d 926, 941 (11th Cir. 2001) ("[R]eviewing [a Batson] claim . . . require[s] us to look over the trial court's shoulder, reconstructing the circumstances surrounding the voir dire of the venire persons and the Batson hearing from the cold record, to decide whether the court correctly determined that the defendant had not raised an inference that the prosecution used its peremptory challenges to remove jurors on account of their race."). The Batson Court itself acknowledged that a trial court's findings on the question of discrimination "turn on evaluation of credibility," and require "great deference" on review. 476 U.S. at 98 n.21, 106 S. Ct. at 1724 n.21.

Hightower urges us to give minimal deference to the trial judge's findings. According to Hightower, (1) the prosecutor failed to offer any evidence to support his bare assertions that he had prosecuted the relatives of the black jurors he struck;

(2) the trial judge failed to demand that the prosecutor go back and question the black jurors he had struck to see if they could be impartial in spite of their relatives' criminal backgrounds; and (3) the prosecutor did not strike white jurors who were as lukewarm on the death penalty as the black jurors he struck. We dismiss the first two contentions out of hand. The prosecutor satisfied his burden of production merely by <u>stating</u> nonracial reasons for his strikes. As the Supreme Court has recognized, "[i]t is not until the <u>third</u> step that the <u>persuasiveness</u> of the [prosecutor's stated reasons] becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." <u>Purkett</u>, 514 U.S. at 768, 115 S. Ct. at 1771 (second emphasis added). Hightower never provided the court with any evidence tending to discredit the persuasiveness of the prosecutor's stated reasons for striking black jurors. The judge was therefore free to accept the prosecutor's stated reasons at face value. Furthermore, he had no duty compel the prosecutor to verify by means of extended voir dire that the black jurors he struck would indeed have been partial to Hightower because of their relatives' criminal backgrounds. <u>Cf.</u> <u>Batson</u>, 476 U.S. at 97, 106 S. Ct. at 1723 ("[T]he prosecutor's explanation [for striking black jurors] need not rise to the level justifying exercise of a challenge for cause.").

Hightower's third contention is also fruitless. It is extraordinarily difficult upon the basis of the cold record to compare different jurors' predispositions toward the death penalty. Because such determinations turn largely on observable "credibility," Wainwright v. Witt, 469 U.S. 412, 429, 105 S. Ct. 844, 855, 83 L. Ed. 2d 841 (1985), the trial court's judgment is entitled to great deference. See id. (holding that a finding of juror bias is a factual matter, reviewed as such under 28 U.S.C. § 2254); United States v. Alston, 895 F.2d 1362, 1367 n.5 (11th Cir. 1990) ("It is of course true that comparing the attributes of the black and white venirepersons will aid the trier of fact and a reviewing court in determining whether the asserted reasons are pretextual or not. The attributes relied upon by the prosecutor in striking potential jurors are not always easily compared, however, and often require an evaluation of the degree to which the prospective juror manifests the stated attribute."). Given our narrow scope of review, we cannot say that the trial judge committed constitutional error in this regard.

In the end, the court was under a duty to weigh all evidence placed before it on the question of whether the prosecutor discriminated. Defense counsel rested their claim upon two main evidentiary bases. First, of the seven strikes the prosecutor used, six were against African-Americans. Second, although the Supreme Court had not yet issued its ruling in Amadeo, and we had not yet issued

ours in Horton, controversy existed over the prosecutor's alleged role in a scheme to minimize the representation of minorities on local juries. On the other hand, militating against a finding of discrimination were the prosecutor's uncontested, specific, and race-neutral reasons for striking each black juror. It appears from the record that the court considered both sides of the question and found that the prosecutor had sufficiently rebutted Hightower's allegation of discrimination. Thus, the Batson mechanism, which is necessary deferential to trial court findings, operated properly in this case. See Miller-El, 537 U.S. at 339, 123 S. Ct. at 1040 ("[T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.").

We are mindful of the harshness with which we criticized Briley in Horton for his past discriminatory practices. We recognize that these past practices are relevant to his discriminatory intent in the case at hand. See Horton, 941 F.2d at 1455. But our task is to determine, in consideration of "all relevant circumstances," Batson, 476 U.S. at 96, 106 S. Ct. at 1723 (emphasis added), and given our constraints under 28 U.S.C. § 2254, whether the state court judgment in this case runs afoul of federal law. We cannot say that it does.

V.

Hightower contends that the trial judge violated his federal constitutional right to an impartial jury by allowing jurors to serve who were impermissibly predisposed toward a death sentence. We find this claim to be procedurally defaulted.[49]

In Witherspoon v. Illinois, 391 U.S. 510, 522, 88 S. Ct. 1770, 1777, 20 L. Ed. 2d 776 (1968), the Supreme Court held that a death sentence "cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or

---

[49]The district court also found procedural default. Our reasoning differs, however. In his present appeal, in the district court, and in the state habeas court, Hightower has framed this claim in essentially the same way. As we discuss in the text, he has argued that the trial judge used the wrong legal standard for excusing jurors for cause based upon their death penalty views—in other words, that the judge used the obsolete Witherspoon "automatic" standard, rather than the proper Adams-Witt "substantial impairment" standard. Hightower has furthermore contended that he was prejudiced by this recurring error, as it resulted in the seating of death-biased jurors Paul Jensen and Rufus Little.

The district court held that Hightower's claim, so stated, was materially different from the one he raised on direct appeal to the Georgia Supreme Court. According to the district court, Hightower claimed on direct appeal that the trial judge erred under Witherspoon by failing to excuse Jensen and Little. Put another way, Hightower claimed a Witherspoon error on direct appeal, but claimed at all subsequent proceedings that Witherspoon wasn't the proper standard to use in the first place. The district court essentially found that Hightower procedurally defaulted his present claim by failing to have framed it in the same way on direct appeal.

We part company with the district court's opinion in 2 respects. First, the district court was incorrect in stating that Hightower raised claims on direct appeal regarding Jensen and Little—in fact, as we go on to explain, he did not. Second, the district court paid undue attention to the misguided way in which Hightower has presented his claim. The crux of Hightower's claim must simply be that jurors Jensen and Little were unconstitutionally permitted to serve. As we discuss in the text, the relevant cases, Witherspoon, Adams, and Witt, merely provide the standard under which juror-specific claims of Hightower's type are examined.

expressed conscientious or religious scruples against its infliction."[50]  Later, in

Adams v. Texas, 448 U.S. 38, 45, 100 S. Ct. 2521, 2526, 65 L. Ed. 2d 581 (1980),

the Court refined this standard, holding that "a juror may not be challenged for

cause based on his views about capital punishment unless those views would

prevent or substantially impair the performance of his duties as a juror in

accordance with his instructions and his oath."  The Court's opinion in Wainwright

v. Witt, 469 U.S. 412, 424, 105 S. Ct. 844, 852, 83 L. Ed. 2d 841 (1985), made

clear that the Adams "substantial impairment" test displaced Witherspoon as

governing law.

Hightower now claims that two persons who served on his jury, Paul Jensen

and Rufus Little, were unqualified to serve under the Adams-Witt standard.  This

---

[50]In Witherspoon, the petitioner claimed that the trial court unconstitutionally excluded jurors opposed to a death sentence.  Hightower, on the other hand, claims that the trial court unconstitutionally failed to exclude jurors predisposed toward a death sentence.  The test announced in Adams and Witt appears to emasculate any legal distinction between these 2 types of cases.  See discussion infra; Ross v. Oklahoma, 487 U.S. 81, 85-86, 108 S. Ct. 2273, 2276-77, 101 L. Ed. 2d 80 (1988) (accepting under the Witt framework the state's concession that the trial court should have excused a juror for cause because of his bias in favor of a death sentence, but holding that such error was harmless because the petitioner had eliminated this juror with a peremptory challenge).  Nonetheless, claims of Hightower's type are still often described as "reverse-Witherspoon" claims, perhaps owing to language the Supreme Court has itself employed.  See, e.g., Morgan v. Illinois, 504 U.S. 719, 731, 112 S. Ct. 2222, 2230-31, 119 L. Ed. 2d 492 (1992) ("We have also come to recognize that the principles first propounded in Witherspoon v. Illinois, the reverse of which are at issue here, demand inquiry into whether the views of prospective jurors on the death penalty would disqualify them from sitting.") (emphasis added) (citation omitted)).  Purely for conceptual purposes, we too use the terms "Witherspoon" and "reverse-Witherspoon" in referring to Hightower's claims.

58

claim differs materially from the one he raised on direct appeal to the Georgia Supreme Court. Before that court, Hightower in his brief enumerated the following relevant errors:

16. The trial court erred in refusing to excuse for cause juror Chilton, who stated unequivocally that if a person was convicted of killing three (3) people, a life sentence was not severe enough and "he ought to get the death penalty."

17. The trial court erred in refusing to excuse for cause juror Thompson who stated that a life sentence would not be adequate penalty if the accused was convicted of voluntary manslaughter.

18. The trial court erred in excusing for cause juror Ponder on the ground that she was opposed to the death penalty in that said juror testified that she would consider the death penalty.

19. The trial court erred in excusing for cause jurors Ponder, Stewart, and Bailey in that to automatically excuse all jurors opposed to the death penalty denied Defendant his constitutional right to be tried by a jury of his peers.

20. The trial court erred in refusing to excuse for cause juror Sheila Allgood who stated unequivocally that she would automatically vote for the death penalty if Defendant were convicted of three murders.

21. The trial court erred in refusing to excuse for cause juror Ruth Allgood on the ground that she was opposed to the death penalty in that said juror testified that she would consider the death penalty.

Thus, Hightower on direct appeal raised numerous Witherspoon and reverse-Witherspoon claims, but none as to jurors Jensen or Little, those whom he presently contends were unqualified to serve. The relevance of this omission is

59

manifest.  Witherspoon claims, dependent as they are upon individual predispositions, are juror-specific.  Having failed to present claims on direct appeal as to Jensen and Little, Hightower procedurally defaulted such claims as a matter of state law.[51]  See Black v. Hardin, 336 S.E.2d 754, 755 (Ga. 1985) (holding that "a failure to make timely objection to any alleged error or deficiency or to pursue the same on appeal ordinarily will preclude review by writ of habeas corpus," absent a showing of cause and prejudice or "a miscarriage of justice where there has been a substantial denial of constitutional rights").  Because he has not shown cause for the default and prejudice resulting therefrom,[52] Wainwright v. Sykes, 433 U.S. 72, 87, 97 S. Ct. 2497, 2506, 53 L. Ed. 2d 594 (1977), or that a fundamental miscarriage of justice would otherwise result, Murray v. Carrier, 477 U.S. 478, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986), Hightower's Witherspoon claims fail.

VI.

_____

[51]Before the state habeas court, Hightower presented the same Witherspoon claims (those regarding Jensen and Little) as he presents now.  The state habeas court did not address these specific claims in its order denying Hightower's petition, however.  Instead, that court addressed a distinct Witherspoon-type claim that is not before us—it held that Hightower procedurally defaulted his claim that the trial judge erred by permitting the prosecutor to question the members of the venire on their death penalty views.

In the brief supporting his application for a certificate of probable cause to appeal to the Georgia Supreme Court, Hightower claimed that the habeas court erred by failing to address his Witherspoon claims as to Jensen and Little.  The supreme court, evidently unmoved, summarily denied the application.

[52]Although Hightower presents a Witherspoon-based claim of ineffective assistance of counsel, we reject it in Part VI.

We turn finally to Hightower's claims of ineffective assistance of counsel.[53]

Hightower contends that his attorneys committed various errors at both phases of his trial and on direct appeal.

The governing standard is that of Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Counsel's performance is constitutionally "deficient" when it "[falls] below an objective standard of reasonableness." Id. at 688, 104 S. Ct. at 2064. We must avoid all temptation to "second-guess" counsel's decisions as to trial strategy. Id. at 689, 104 S. Ct. at 2065. Instead, we are to examine "the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690, 104 S. Ct. at 2066.

---

[53]We affirm without further discussion the district court's rejection of the following 2 claims of ineffective assistance: (1) that trial counsel failed fully to investigate Hightower's case, develop mitigating evidence, and seek correct jury instructions; (2) that trial counsel distanced themselves from Hightower in front of the jury.

To establish prejudice, Hightower " must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. Put another way, he must establish that counsel's errors "undermine confidence in the outcome" of the case.[54] Id.

Ineffectiveness of counsel is a mixed question of law and fact. Id. at 698, 104 S. Ct. at 2070. Thus, we review these claims de novo. Chandler v. United States, 218 F.3d 1305, 1312 (11th Cir. 2000).

---

[54]The Strickland Court articulated different standards for challenges to convictions and sentences:

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

466 U.S. at 695, 104 S. Ct. at 2068-69. Although Hightower claims that his attorneys were ineffective at both phases of his trial and on direct appeal, he does not clearly differentiate between errors that affected the guilt determinations and errors that affected the sentences. This differentiation is of no consequence, as we reject each of Hightower's claims of ineffective assistance as to both phases of his trial and as to his direct appeal.

## A.

Hightower first argues that his counsel failed to maintain a coherent defense theory.[55]  We find no basis upon which to grant relief here.

Counsel testified at the hearing before the state habeas court that their strategy was to save Hightower's life, rather than to seek an acquittal.  This was a reasonable strategic choice, given that Hightower confessed to the murders on the same day they occurred.  Counsel only pursued this sentence-focused strategy after discussing it with Hightower and gaining his approval.  Hightower has failed to

---

[55]Relatedly, Hightower claims that trial counsel were ineffective for failing to present the testimony of a "competent" psychiatrist.

In Part III, we hold that Hightower was not entitled under Ake to the assistance of a psychiatrist, but that in the alternative, even if he was so entitled, trial counsel received funds they could have used for a psychiatric expert.  Hightower's ineffective assistance claim depends upon the second alternative.  He states the issue succinctly in a footnote in his brief: "If the funds provided by the state court *were* adequate, then trial counsel should have spent them to hire the qualified psychiatrist they knew was crucial to their defense."  Essentially, Hightower challenges the way in which counsel spent the $5,750 in defense funds the court granted.

We conclude that Hightower has failed to establish Strickland deficiency in counsel's performance.  Apart from blanket assertions that counsel should have spent some money on a psychiatrist, he gives no specific indication as to how they should have acted differently.  He does not specify, for example, (1) how much counsel should have used for a "competent" psychiatrist; (2) whose services counsel should have declined to employ in order to retain a "competent" psychiatrist, e.g., the investigator, the jury specialist, or Dr. Albrecht, all of whom were paid out of the provided funds; or (3) whether counsel should have hired a psychiatrist in addition to, or instead of, Drs. Moore and Albrecht, the psychologists who testified at trial.  Because he has failed to demonstrate with specificity how counsel erred in spending the funds, Hightower essentially asks us, in direct contravention of Strickland, to apply the benefit of hindsight to scrutinize counsel's spending decisions.  466 U.S. at 689, 104 S. Ct. at 2065.  This we will not do.

articulate any concrete attorney error that prejudiced his defense.[56] This claim must

therefore fail.

## B.

Hightower next claims that his attorneys were ineffective at trial for failing

to challenge for cause or peremptorily strike two jurors who, in his view, appeared

predisposed toward a death sentence.[57] He also contends that defense counsel were

---

[56]Hightower contends that his attorneys prejudicially altered their theory of defense during the course of the trial. He points to the fact that counsel accepted a "guilty, but mentally ill" instruction at the guilt phase charge conference after initially opposing such an instruction. But we cannot see how Hightower suffered prejudice in this regard. Reasonably believing that a "not guilty" verdict was unlikely, counsel evidently felt that it was to Hightower's benefit for the jury to have an alternative to straight "guilty" verdicts. That the jury did not select this alternative is immaterial to a claim of ineffective assistance of counsel.

We must clarify that this ineffective assistance claim is wholly separate from a claim that Hightower raised in the state habeas court and the district court. Before those courts, he claimed that the trial judge erred by failing to give to the jury the complete "guilty, but mentally ill" instruction required by O.C.G.A. § 17-7-131(b)(3)(B). Both courts found this claim procedurally defaulted. The question before us is merely whether trial counsel were ineffective in not objecting to a "guilty, but mentally ill" instruction in the first instance. We conclude that they were not. As to the next question, i.e., whether the trial judge erred in giving an improper "guilty, but mentally ill" instruction, Hightower has not presented the question to us, and we therefore do not address it.

[57]Hightower also contends that counsel were ineffective at trial and on direct appeal because of their ignorance of the correct standard, i.e., Adams-Witt instead of Wainwright. See Part V. So stated, this claim misses the mark. Hightower cannot prevail on a claim of ineffective assistance without showing that he suffered prejudice. As to a reverse-Witherspoon-based claim of ineffective assistance, Hightower must show that counsel's ignorance of the correct standard resulted in the seating of jurors who were unconstitutionally biased in favor of death. Practically speaking, Hightower must show that because of their ignorance, defense counsel failed properly to deal with these unacceptable jurors, whether by neglecting to (1) challenge them for cause, (2) strike them peremptorily, or (3) claim on direct appeal that the trial judge erred by seating them. As with Hightower's main Witherspoon claims, we examine this ineffective assistance claim in a juror-specific manner.

ineffective on direct appeal for failing to enumerate as error the court's seating of these jurors. The district court found that even though counsel may have been deficient, Hightower failed to establish prejudice resulting therefrom. We agree.

We first consider his claim as to juror Paul Jensen. The relevant portion of defense counsel's voir dire of Jensen, i.e., that which revealed his attitude toward a death sentence, reads as follows:

MR. BUICE: Mr. Jensen? Where are you on that? Would the fact that three people died . . . ?

MR. JENSEN: He's convicted of three murders?

MR. BUICE: Yes.

MR. JENSEN: It would be very—it would determine—it [sic] would have to determine the case—the case would have to determine how I'd feel exactly, but it would be very hard for me not to vote for the death penalty because of three murders.

MR. BUICE: Well, would the fact of three murders, then, tend to close your mind to other considerations?

MR. JENSEN: Right now it would, but it would have to be determined by the severity of the case and what was involved in determining of the three murders.

Counsel challenged Jensen for cause on the grounds that (1) he was a college student whose worry about missed coursework would divert his attention, and (2)

he appeared to favor a death sentence if drugs or alcohol had contributed to the commission of the crime. The court rejected the challenge.

We conclude that this brief voir dire exchange provides no basis for relief.[58] Although Jensen suggested that he would favor a death sentence if three murders were established, he also indicated that he could not form an opinion on the sentences until he heard the evidence. Given the difficulty of reviewing such equivocal answers from the cold record, years after they were uttered, it is obvious why we accord great deference to trial judge determinations of juror bias. See, e.g., Wainwright v. Witt, 469 U.S. 412, 429-30, 105 S. Ct. 844, 855, 83 L. Ed. 2d 841 (1985) (holding that a trial court's determination of juror bias is a matter of fact, to be reviewed as such under 28 U.S.C. § 2254). The trial judge, in a superior position to observe Jensen's credibility and demeanor, refused to excuse Jensen for bias. We cannot say that Hightower suffered prejudice from counsel's failure to strike Jensen peremptorily or to allege on direct appeal that the court erred in seating him.

We next consider Hightower's claim as to juror Rufus Little. Defense counsel's voir dire of Little proceeded as follows:

---

[58]In support of his claim, Hightower offers no evidence beyond the excerpted portion of Jensen's responses that we reproduce here.

MS. GEORGE:     . . . I am going to again ask the same question and I am going to say this with two questions. If a person has been convicted of murder and the murder of three people, are you strongly in favor, somewhat in favor, or somewhat opposed to the death penalty? . . . Okay, Mr. Little?

MR. LITTLE:     Strongly for it if it has been proven.

MS. GEORGE:     If it's been proven?

MR. LITTLE:     Yes.

. . .

MS. GEORGE:     If there were a conviction of three deaths [sic], three people involved, three people had died, could you vote for a life imprisonment, would that be severe enough punishment for you? . . . How about you, Mr. Little?

MR. LITTLE:     I would have to hear the case. Three murders, you know, that's cruel, but there may be something out of it to prove without a doubt, well then a life would—I'd have to hear the case.

. . .

MS. GEORGE:     All right. How about you, Mr. Little? Would you automatically vote for the death penalty if there was a conviction of three people?

MR. LITTLE:     If they proved without a doubt he did it.

MS. GEORGE:     You would automatically do it?

MR. LITTLE:    If they proved without any doubt, based on the circumstances, I would. But it's hard to say until I hear the whole case.

MS. GEORGE:    But you did say if the person was convicted beyond a reasonable doubt, you would automatically vote for the death penalty?

MR. LITTLE:    Automatically—like I say I would automatically—like I say I would have to hear the case. Like I say I would automatically vote for the . . .

MS. GEORGE:    That's all I have Your Honor.

Counsel did not (1) challenge Little for cause, (2) exercise a peremptory strike against him, or (3) claim on direct appeal that it was error to seat him. Again forced to review the cold record to detect bias,[59] we decline to grant relief. In our view, Little's statements during voir dire, in their totality, do not reflect a pro-death sentiment sufficient to establish prejudice. Even as defense counsel sought to pin down his bias, Little continually expressed that he would need to hear the whole case before deciding on the proper punishment. We agree with the district court that Hightower failed to show that Little's views on the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Id. at 424, 105 S. Ct. at 852.

---

[59]Hightower produces no evidence as to Little beyond this excerpt of his examination.

## VII.

We have considered Hightower's claims and find them to be without merit.

The judgment of the district court is, accordingly,

AFFIRMED.

WILSON, Circuit Judge, concurring:

I agree with our ultimate conclusion that Hightower has not been successful in presenting a claim under *Batson*. In this case, we are obliged – and perhaps constrained – to defer to the state courts. This principle, coupled with the fact that the trial court did not have before it any real evidence of Briley's consistent pattern of discriminatory conduct,[1] supports our conclusion today.

However, I am quite concerned with the manner in which the state courts have applied *Batson* in this case. It appears that they have inappropriately condensed *Batson*'s three-part inquiry into two, thereby risking a serious constitutional error. I write separately to address my concerns, and to stress the importance of adherence to *Batson*'s requirements.

I first repeat the procedure that *Batson* mandates. First, the defendant must establish a prima facie case of discriminatory intent on the part of the prosecution.

---

[1] Our opinion notes *supra* "the harshness with which we criticized Briley in [*Horton v. Zant*, 941 F.2d 1449 (11th Cir. 1991)] for his past discriminatory practices." *Supra* at ----. Specifically, in *Horton*, we noted that Briley penned a memorandum (also mentioned in footnote 46, *supra*) that directed a clerk of court to limit the number of blacks, women, and young people on juries. *See Horton,* 941 F.2d at 1455. We also discussed in *Horton* a statistician's finding that in capital cases in eight Georgia counties involving black defendants over several years, Briley used 89.9% of his strikes against black venire members. *See id.* at 1458. In capital cases involving black defendants and white victims, that number jumped to 94.1%. *See id.* The case discussed a number of other similarly shocking statistical and mathematical findings. *See generally id.* at 1457-59. We found that under such odds, "courts cannot make a blind leap of faith that there exists some set of legitimate factors which correlates one-to-one with the race of the venire members." *See id.* at 1458.

*See Batson*, 476 U.S. at 96. Once a court has determined that a defendant has established a prima facie case, "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *See id.* at 97. If the state clears this hurdle, the trial court then has the responsibility to determine whether the defendant has established purposeful discrimination. *See id.* at 98; *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (per curiam). An analysis of the state courts' opinions in this case raises the question of whether they properly applied *Batson*'s third step.

The Georgia Supreme Court's discussion as to the *Batson* issue is so brief that it is unclear whether that court even reached and resolved *Batson*'s third step at all. The Georgia Supreme Court's entire discussion of Hightower's *Batson* claim is as follows:

> The defendant contends the prosecution was guilty of racial discrimination . . . . The prosecutor used only seven of his authorized 10 peremptory strikes. He used six of those seven strikes against black prospective jurors. The record shows that at least two black prospective jurors were struck by the defendant after having been accepted by the prosecutor. The prosecutor explained his peremptory challenges. Four of the challenged prospective jurors were closely related to persons convicted of serious felonies. The other two were conscientiously opposed to the death penalty, although not to the extent they were excused for cause. The trial court found that the prosecutor had articulated legitimate non-racial reasons for his challenges. Even assuming the defendant made out a prima facie case, . . . the trial court's determination is not clearly erroneous.

*Hightower v. State*, 386 S.E.2d 509, 512 (Ga. 1989) (citations omitted). The

language in the final two sentences quoted above seems to suggest that once a

prosecutor has articulated reasons for his challenges, a court's finding that those

reasons are race-neutral is sufficient to end the *Batson* inquiry.[2] However, such a

finding only triggers the third step in the analysis; we regard each step of *Batson*'s

inquiry as a prerequisite to the next. *Cf. Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder

Realty Co.*, 236 F.3d 629, 636 (11th Cir. 2000) ("As [*Batson*'s] framework makes

clear, the establishment of a *prima facie* case is an absolute precondition to further

inquiry into the motivation behind the challenged strike.").

Once Hightower established a prima facie case of discrimination (or, once

the Georgia Supreme Court *assumed* that Hightower established a prima facie case

of discrimination), the burden shifted to the state to come forward with a neutral

explanation for challenging black jurors. *See Bui v. Haley*, 321 F.3d 1304, 1313-14

---

[2] This interpretation of the Georgia Supreme Court's opinion is buttressed by the fact that the trial court only made explicit determinations with regard to the first two steps. After hearing and approving each of the reasons for the prosecution's strikes, the court stated "I find that the defendants have failed to establish a prima facie case of discrimination on the part of the district attorney. I further find that as to each individual strike, the State has presented an articulable, nonrace related reason for striking the prospective juror." Tr. at 626. As I discuss *infra*, the trial court's threshold finding that Hightower failed to establish a prima facie case was questionable.

Further, it is unclear what the trial court's approach to *Batson* actually was. After improperly failing to find that a prima facie case had been established, the trial court proceeded to *Batson*'s second step – a step that it technically needn't have reached. Then, once it attempted to engage in *Batson*'s full inquiry, it failed by stopping short of *Batson*'s third step.

(11th Cir. 2003). Once the state cleared that hurdle, the court then had the responsibility to determine whether Hightower had established purposeful discrimination. *Id.* at 1314. The Georgia Supreme Court appears to have been evaluating not whether Hightower had met his burden of establishing purposeful discrimination, but merely whether the prosecution's proffered reasons for the strikes were race-neutral. The approach taken could inappropriately turn *Batson* into a test of the sufficiency of the prosecution's reasons for its strikes. An entire additional step, in which the strength of Hightower's case was weighed against the persuasiveness of the state's proffered reasons for the strikes, appears to be missing from this case.

Moreover, the Georgia Supreme Court's conclusion is questionable in that it found as not clearly erroneous a trial court finding that plainly ran contrary to Supreme Court precedent. The trial court's primary error was in failing to find that Hightower had established a prima facie case of discrimination. The burden on a defendant seeking to establish a prima facie case is not high; he must merely show that "'he is a member of a cognizable racial group'" and that the 'relevant circumstances raise an inference' that [the prosecution] has 'exercised peremptory challenges to remove from the venire members of [his] race.'" *Fludd v. Dykes*, 863 F.2d 822, 829 (11th Cir. 1989) (quoting *Batson*, 476 U.S. at 96).

Obviously, Hightower demonstrated his being a member of a cognizable racial group, and his counsel's argument at trial, coupled with the long odds of six of seven black jurors being struck from the jury, together were sufficient to raise at least an inference of improper conduct. It is difficult to determine what else the trial court could have required of Hightower for the presentation of his prima facie case. In short, the trial court raised the standard set by the Supreme Court. *See Holloway v. Horn*, 355 F.3d 707, 728 (3d Cir. 2004) ("The defendant generally meets [his] burden if there is a pattern of strikes or if the prosecutor's questions and statements during voir dire support an inference of discriminatory purpose.").

However, our obligation to defer is great, and while it appears that the Georgia Supreme Court could have engaged in a more thorough inquiry as to Hightower's *Batson* claim, it has not affirmatively misstated federal law. Our task at this stage is to review a state court's decision, and not its rationale. *See Wright v. Sec'y for the Dep't of Corrs.*, 278 F.3d 1245, 1255 (11th Cir. 2002). Although a state court opinion containing a "conspicuous misapplication of Supreme Court precedent" is not entitled to deference under the AEDPA, "[w]e will not presume that a state court misapplied federal law, and absent indication to the contrary will assume that state courts do understand 'clearly established Federal law ... as determined by the Supreme Court of the United States.'" *Id.* at 1256 n.3 (quoting

74

28 U.S.C. § 2254(d)(1)).  No such great deviation from federal precedent is present in this case.

Moreover, even if the Georgia Supreme Court *had* engaged in all three of *Batson*'s required steps, it is incredibly unlikely that the result in this case would have been any different.  The burden of persuasion regarding purposeful discrimination never shifted from Hightower.  The case he presented on this issue was not particularly strong and was met by ostensibly race-neutral reasons for the state's strikes.  We now know quite well of Briley's shameful history of discriminatory conduct, and I question what a better defense could have exposed in this case.[3]  Still, after consideration of the record, I am constrained to join in today's decision.

A trial judge's stewardship over the jury selection process is not to be taken lightly.  As Justice Powell wrote, "[e]xclusion of black citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure."  *Batson*, 476 U.S. at 85.  With this in mind, I stress the singular importance of the trial court's role in *Batson*'s third step.  By appearing to evaluate only the race-neutrality of the prosecution's reasons for its strikes and not clearly

---

[3] I note, however, that Hightower's *Batson* claim was not presented in the context of his ineffective assistance of counsel claim.

making a determination as to the entire record, a court runs the risk of virtually

guaranteeing victory for the prosecution in every case. Trial judges must be

vigilant to ensure that *Batson*'s test does not become a vehicle simply for

approving the sufficiency of the prosecution's reasons for its strikes. The potential

consequences of anything less are far too great.